**DRUVEN PC**
CASEY BRYANT (Fed Bar No. 30215)
7200 Wisconsin Ave, Ste 500
Bethesda, MD 20814
Telephone: 213-838-0048
Email: cbryant@druven.law


Attorneys for Plaintiffs,
MJ Enterprise Holdings, Inc., a Maryland Corporation
Ross Markajani, an individual

## UNITED STATES DISTRICT COURT

## DISTRICT OF MARYLAND

| | |
|---|---|
| MJ Enterprise Holdings, Inc., a Maryland Corporation; Ross Markajani, an individual;<br><br>                    Plaintiffs,<br><br>v.<br><br>SPIFFY FRANCHISING, LLC, a Delaware limited liability company; GET SPIFFY, INC., a Delaware corporation, Scot Wingo, an individual; Karl Murphy, an individual; Connor Finnegan, an individual; and DOES 1 through 20, inclusive;<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW MJ Enterprise Holdings, Inc. ("MJ Enterprise Holdings") and Ross Markajani ("Markajani") hereby complain of Spiffy Franchising, LLC. ("Spiffy Franchising") and Get Spiffy, Inc. ("Get Spiffy") (collectively, "Spiffy"), and Scot Wingo ("Wingo"), Karl Murphy ("Murphy"), and Connor Finnegan ("Finnegan") (Wingo, Murphy, and Finnegan collectively, the "Individual Defendants"), and Does 1 through 20, inclusive (collectively, "Defendants") and allege as follows:

## THE PARTIES

1.     MJ Enterprise Holdings is a corporation incorporated and existing under the laws of the State of Maryland, having a principal place of business at 7507 Canton Way, Glen Burnie, MD 21060.

2.     Ross Markajani was, at all times mentioned herein, a resident of Maryland, residing at 7507 Canton Way, Glen Burnie, Anne Arundel County, Maryland 21060. Markajani was, at all times mentioned herein, the Chief Executive Officer and Manager of MJ Enterprise Holdings. Unless otherwise indicated, Plaintiff MJ Enterprise Holdings, Inc. and Plaintiff Ross Markajani will collectively be referred to as "Plaintiffs."

3.     Upon information and belief, Spiffy Franchising LLC is a limited liability company organized and existing under the laws of the State of Delaware, having a principal place of business at 4506 S Miami Blvd., Suite 150, Durham, North Carolina 27703.

4.      Upon information and belief, Get Spiffy, Inc. is a Delaware corporation, having a principal place of business at 4506 S Miami Blvd., Suite 150, Durham, North Carolina 27703.

5.      Upon information and belief, Scot Wingo ("Wingo") is a citizen and resident of North Carolina and was at all relevant times the Chief Executive Officer of Get Spiffy and Co-Founder of Spiffy at 4506 S Miami Blvd., Suite 150, Durham, North Carolina 27703. Wingo has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Wingo has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Wingo formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein,

1

COMPLAINT

Wingo transacts or has transacted business in this District and throughout the United States.

6.      Upon information and belief, Karl Murphy ("Murphy") is a citizen and resident of North Carolina, residing at 105 Brighton Court, Chapel Hill, North Carolina 27516, and was at all relevant times the President of Get Spiffy and Co-Founder of Spiffy. Murphy has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Murphy has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Murphy formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein, Murphy transacts or has transacted business in this District and throughout the United States.

7.      Upon information and belief, Connor Finnegan ("Finnegan") is a citizen and resident of North Carolina, residing at 8701 Eagle View Drive, Durham, North Carolina 27713, and was at all relevant times the Vice President of Strategy at Get Spiffy and Head of Spiffy Franchising. Finnegan has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices set forth in this Complaint. Finnegan has advertised, marketed, distributed, or sold Spiffy franchises to consumers throughout the United States, including in this District. At all times material to the facts in this Complaint, Finnegan formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendants. In connection with the matters alleged herein, Finnegan transacts or has transacted business in this District and throughout the United States.

8.      The true names and capacities of defendants Does 1 through 20, inclusive, are unknown to Plaintiffs, who sue these defendants by fictitious names. Plaintiffs will amend this complaint to allege the true names and capacities of these Doe defendants when ascertained. Plaintiffs are informed and believe, and thereupon allege, that Does 1 through 20 are each responsible in some manner for the events alleged in this complaint, and that they proximately caused damage to Plaintiffs by their conduct.

9.      Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, each

of the Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of other defendants and each and all were at all times acting in the scope of the agency, affiliation, alter-ego relationship and/or employment; and actively participated in or ratified and adopted, or both, each and all the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiffs' rights and the harm and damage to Plaintiffs proximately caused thereby.

## **NATURE OF THE ACTION**

10.     Spiffy is a nationwide, app-based car service franchise providing a range of contactless, eco-friendly services, such as hand car washing, disinfection, detailing, oil changes, tire maintenance, and other related offerings. Get Spiffy was founded by Scott Wingo in 2014, with the contactless car care services developed soon thereafter. The company began offering franchises in 2020 at the start of the COVID pandemic.

11.     Markajani was the kind of franchisee Spiffy wanted to appeal to, claiming franchisees did not need sales experience, which Markajani did not have. In or about February 2022, Markajani noted a Facebook advertisement regarding Spiffy franchise opportunities in his area. Markajani contacted Spiffy regarding the advertisement and attended the Spiffy Franchise Discovery Day on or about March 3, 2022. The discovery day presentation focused especially on the growth projections. Ultimately, Markajani would later discover that Defendants fraudulently inflated their projections to lure in new franchisees.  On or about March 9, 2022, Plaintiffs executed the Spiffy Franchise Agreement ("Franchise Agreement").

12.     On August 15, 2022, after many delays, Markajani launched his Spiffy franchise. The then Franchise Vice President, Mike Tolzman ("Tolzman"), came to Baltimore with no official agenda or guidance on how training would be conducted. Furthermore, Markajani had not received the pre-launch phones which were promised with the van delivery, something that shocked even Tolzman.

13.     To make matters even worse, after several delays in launching the franchise system, Markajani was promised two vans would be provided by the time MJ Enterprise Holdings launched, but only received one due to an alleged van shortage, with no estimated time given of when the second van

would be provided.

14.     While waiting for the phones to arrive, Tolzman suggested Markajani visit some of Spiffy's National Accounts. They visited Hertz Car Rental ("Hertz"), NextCar Rental ("NextCar"), Enterprise Rent-A-Car ("Enterprise"), and Avis Car Rental ("Avis"). During these visits, it quickly became clear that Spiffy was the preferred vendor and not assigned to provide daily services to these accounts.

15.     It became abundantly clear that Defendants fraudulently induced Plaintiffs into signing a Franchise Agreement with Spiffy through a series of fraudulent misrepresentations and concealed material facts.

16.     MJ Enterprise Holdings is among the numerous franchisees deceived by Spiffy through its fraudulent and dishonest business tactics. Like other Spiffy franchisees, Plaintiffs decided to invest in Spiffy's franchise system based on representations made by Spiffy and its agents.

17.     At the time, Plaintiffs, along with many other Spiffy franchisees, lacked experience operating mobile vehicle care and service businesses, a fact that Defendants were aware of and exploited, consistently reassuring Plaintiffs that no previous experience was necessary for a Spiffy franchise to be successful.

18.     Relying on Spiffy's fraudulent misrepresentations and concealed material facts, Plaintiffs, like many other Spiffy franchisees, made very substantial investments in opening the franchises. These significant investments included the initial franchise fees paid to Spiffy, leases for customized vehicles, purchases of equipment, allocations of working capital, personal loans, and employee training. While these financial investments were (and continue to be) considerable, they are overshadowed by the time, effort and energy invested by Plaintiffs in pursuit of the "success" promised by Spiffy.

19.     As a result of Defendants' misrepresentations and violation of the Maryland Franchise Law and Registration ("MFLR") and other breaches of law, Plaintiffs seek recission, damages, costs, and attorneys' fees, the exact amount of which will be determined at trial.

## **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, in

that this is a civil action arising under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §1962).

21.    The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332. The Plaintiffs, MJ Enterprise Holdings, Inc. and Ross Markajani, are citizens of Maryland.  The Defendants, Spiffy Franchising, LLC, Get Spiffy, Inc., Scot Wingo, Karl Murphy, and Connor Finnegan, are all citizens of states other than Maryland.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

22.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

23.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) at least because a substantial portion of the events complained of herein took place in this Judicial District.

24.    This Court has personal jurisdiction over Spiffy because it transacted business in the State of Maryland, including in this District, with Plaintiffs pursuant to a Franchise Agreement that is the subject of this Complaint and because Spiffy registered with the Securities Division of the Maryland Attorney General's Office to sell franchises in Maryland.

25.    This Court has personal jurisdiction over Wingo because he has engaged in substantial, continuous, and systematic contacts with Maryland, including in this District.

26.    This Court has personal jurisdiction over Murphy because he has engaged in substantial, continuous, and systematic contacts with Maryland, including in this District.

27.    This Court has personal jurisdiction over Finnegan because he has engaged in substantial, continuous, and systematic contacts with Maryland, including in this District.

## FACTUAL ALLEGATIONS

A.    **Spiffy Utilized Fraudulent Business Practices to Entice MJ Enterprise Holdings to Become a Spiffy Franchisee**

28.    In or about February 2022, Markajani came across a Facebook advertisement regarding Spiffy franchise opportunities in his area and contacted Spiffy. On or about March 3, 2022, Markajani

attended the Spiffy Franchise Discovery Day. Spiffy's presentation regarding the five-year scalability and growth model persuaded Ross to purchase a franchise, signing a Franchise Agreement on or about March 9, 2022. After misleading Plaintiffs into purchasing a franchise, Defendants continued their fraudulent and unfair business practices.

29.     Plaintiffs experienced significant delays in the launch of the franchise, some due to zoning issues imposed by the state of Maryland. Despite extensive efforts, Plaintiffs were unable to locate a warehouse zoned for "C" (auto repair shop) that was willing to assume the risk associated with storing up to 1,500 gallons of oil, as required by Spiffy.

30.     The recommended storage solution for this volume of oil involved the use of three 500-gallon tanks. Notably, Spiffy advised that one of these tanks should be filled with 10w30 oil for medium to heavy-duty trucks. To this day, Plaintiffs still have 7/8 of a 500-gallon tank filled with this type of oil, demonstrating the significant excess that was required to meet Spiffy's ineffective mandates. Consequently, Plaintiffs were compelled to construct a new shop to comply with the stringent requirements imposed by Spiffy.

31.     In preparation for the business launch, Plaintiffs sought guidance from Spiffy regarding the chemicals to be purchased. Rather than providing direct assistance, Spiffy instructed Plaintiffs to consult with the most recent Spiffy franchisee for their purchase recommendations.

32.     This guidance resulted in an expenditure of which a substantial portion remains unsold and unused, with ¾ of the purchased product still in stock. This demonstrates the financial burden imposed on Plaintiffs due to inadequate and inappropriate guidance from Spiffy and due to its ineffective and unprofitable franchise business model.

33.     After several weeks of delays, MJ Enterprise Holdings franchise launched on or about August 15, 2022. The launch itself was not without additional difficulties and delays. Defendants were to provide pre-launch phones to ensure the business runs smoothly, but the phones were delayed by a few days, which shocked even Spiffy's then Vice President, Mike Tolzman ("Tolzman").

34.     Additionally, Plaintiffs were told they would receive two vans for the launch of the

franchise but ultimately only received one van, claiming there was a van shortage. Plaintiffs were not provided with an estimated date of when the second van would be delivered, significantly impacting MJ Enterprise Holdings' growth opportunity as the business was limited to accepting only a certain amount of work.

35.     As an interim solution, Defendants supplied Plaintiffs with a van from their Delaware Corporate location, a site that had formerly operated as a franchise where the franchisees had already exited the system. Upon receiving the van from Delaware, Plaintiffs determined the Vehicle Modular Auxiliary Cooling (VMAC) System was inoperable, making it unfeasible to perform preventive maintenance services for customers. The circumstances significantly hindered the Plaintiffs' potential for growth by drastically limiting the number of customers they were able to service, effectively sabotaging their chances for success from the outset.

36.     In an attempt to avert the franchise's failure and avoid operating at a loss, Plaintiffs purchased two mobile carts from Spiffy around October 2022. These carts were prepared to begin services for Enterprise in the evenings starting in the second week of November 2022. Unfortunately, due to a lack of sufficient demand, the carts remained unused and continue to sit idle at the facility.

37.     Plaintiffs did not receive the remaining vans until about February 2023, half a year after the launch of the franchise.

**B.     Spiffy's Continued Its Fraudulent and Misleading Business Practices**

**i.     Spiffy Vans**

38.     Plaintiffs were consistently informed that the cornerstone of their success hinged on acquiring the maximum number of Spiffy service vans possible. However, this assurance was swiftly undermined, as Plaintiffs did not receive the full complement of vans until six months after the franchise's launch, significantly hampering their ability to achieve the promised success.

39.     Additionally, the Spiffy Vans had "uplifts" that could only be performed by Spiffy, who would then essentially lease them back to Franchisees via Mike Albert Fleet Solutions ("Mike Albert").

40.     For example, Mike Albert would "pay" Spiffy directly for the uplift (e.g., $26,000 per van)

Case 1:24-cv-03194-RDB    Document 1    Filed 11/04/24    Page 9 of 27

even though the actual cost of the uplift is an estimated $8,000 to $10,000.

41.    The Spiffy franchisees would then lease the van from Mike Albert, who would amortize the cost of the uplift as part of the Franchisee's monthly payment, thereby inflating the monthly payments to approximately $1,200 per month per van.

42.    To add insult to injury, the Spiffy vans turned out to be mechanical nightmares, as Plaintiffs, along with many other Spiffy franchisees, were forced to bring their vans to third-party servicers after Spiffy failed to resolve a significant issue preventing correct oil suction for oil changes and water reclamation.

43.    The consensus from third-party servicers was that Spiffy's "uplift" was done with cheap parts, as well as being unnecessary and overly complicated.

### ii.    Spiffy Fleet Accounts

### a.    Enterprise Rent-a-Car

44.    MJ Enterprise Holdings was contractually obligated to service all Spiffy national accounts, especially Enterprise, and perform preventative maintenance services, which included oil changes and tire rotations.

45.    Indeed, these fleet accounts were a major selling point for Spiffy, who enticed franchisees like Plaintiffs with promises of endless profits derived from servicing wave after wave of Enterprise vehicles.

46.    However, shortly after beginning operations as a Spiffy Franchisee, Plaintiffs began to realize that while Enterprise may be a boon for Spiffy, it would prove to be not only unprofitable but also create a loss for Plaintiffs.

47.    In addition to the challenges of fulfilling requests with only a single van, the services provided to Enterprise consistently resulted in financial losses for the Plaintiffs. When accounting for the cost of employing two technicians per Enterprise order—including labor, taxes, and workers' compensation—alongside daily expenses such as rent, van lease, insurance, and cost of goods sold, the oil change service invariably operated at a loss to the business

8

COMPLAINT

###### b.     Amazon

48.     During the Franchise Discovery Day, Spiffy asserted that it was an Amazon Delivery Service Partners ("DSP") fleet approved vendor. This, however, was a misrepresentation.

49.     Markajani was also misled about fleet servicing of Amazon vehicles. He was in a unique position in this regard because he also operates as an Amazon DSP fleet and intended to utilize the Spiffy franchise to service his fleet. Spiffy's conduct with regard to Amazon DSP fleet owners was particularly appalling, including deceptive pricing strategies, falsely presenting themselves as an approved vendor for Amazon DSP despite this not being the case, and instructing franchisees to conduct vehicle maintenance in wholly unsuitable locations such as storage units.

50.     Markajani's initial interest in the franchise model was predicated on the ability to efficiently service his own Amazon DSP fleet. Unfortunately, this aspect devolved into significant operational disruptions, primarily due to improper invoicing practices that led to vehicles being sidelined unnecessarily.

51.     On top of its deceptive strategies, Spiffy failed to provide essential training and insight into the specific requirements for maintaining fleet vehicles until on or about January 25, 2023. This oversight was significant as it pertained to the comprehensive maintenance needs that extend beyond the standard 5,000-mile preventative maintenance cycle.

52.     The fleet management application utilized for service requests did not require the input of vehicle mileage, resulting in frequent scenarios where necessary parts for additional preventative maintenance (PM) services were unavailable. Consequently, technicians, who lacked adequate training for these additional services, struggled to fulfill maintenance requirements. This deficiency in the system was highlighted when an experienced technician resigned after just three months due to insufficient work.

53.     Moreover, the fleet management application proved to be excessively cumbersome, complicating the process for fleet managers to request services efficiently. This often necessitated manual entries or direct, in-person service requests. A significant communication gap existed, as most fleet owners and managers were not informed about the crucial services required at specific mileage milestones, leading

COMPLAINT

to only partial maintenance being recorded in the system. This lapse in full maintenance compliance caused numerous vehicles to be taken out of service, disrupting operations.

54.     Around October 2022, Spiffy introduced a new pricing model for Amazon fleet owners by offering a "Free Wash" with an oil change. This model was intended to bridge the gap in labor hours for fleet operations. However, it is important to highlight that "Fleet Wash" is not included under the terms of the lease agreement. Additionally, the oil change fee was surreptitiously increased by $25 to $35 depending on the vehicle type.

55.     By April 2023, a Portable Document Format ("PDF") was circulated that outlined the recommended procedures for performing fleet services. This document itself contained several concerning recommendations that contradicted regulatory standards. For instance, it suggested purchasing a storage unit to conduct maintenance operations—a recommendation that blatantly disregards zoning laws concerning mobile fluid exchanges and poses a risk of significant fines.

56.     These cumulative issues not only led Plaintiffs to lose an Amazon fleet customer but also significantly eroded confidence in promoting Spiffy's services, due to ongoing operational difficulties and the questionable integrity of previously completed services.

**iii.     Spiffy's Accounting Practices**

57.     Plaintiffs consistently encountered substantial issues with accounts receivable throughout the year performing services under Spiffy's franchise model.

58.     Spiffy was responsible for handling all payment processing, placing Plaintiffs in a precarious position,

59.     The accounts receivable ("A/R") processes proved problematic, compounded by a lack of transparency and support from Spiffy. For example, Plaintiffs were unaware of service rejections logged in the Auto Integrate ("AI") system until April 2023, with no detailed explanations provided for these rejections or guidance on how to rectify them.

60.     It required multiple discussions with Spiffy to address each rejection, highlighting a disconnect in the information visible to franchisees versus what was available to the corporation. At one

point, Plaintiffs' outstanding A/R balance exceeded $25,000.

61.    This practice is representative of Spiffy's policy of placings its corporate needs above those of Spiffy franchisees.

**iv.    Spiffy's Sales & Marketing Tactics**

62.    Spiffy sales and marketing support has ranged from useless to nonexistent.

63.    Spiffy's assistance with leads was also subpar. Markajani submitted proposals and conducted follow-up calls, but despite his efforts, he lacked prior experience in sales and Spiffy did not provide any training on sales techniques.

64.    Markajani was merely given cursory guidance from the Growth and Marketing team to "figure it out" on his own.

65.    In late August 2022, Markajani sought the expertise of a marketing firm that had previously assisted his wife's business. The firm's initial assessment highlighted several potential improvements, particularly stressing the need to access analytics for Spiffy's website. The firm identified issues such as a confusing website layout and a cumbersome booking process, which deterred potential customers.

66.    Despite these insights, when Markajani relayed these findings to Spiffy, the response was discouraging. While they acknowledged his initiative, they informed him that the changes suggested by the marketing firm were not authorized. The directive from Spiffy was to maintain uniformity and brand protection, restricting any site-specific enhancements or blogs.

67.    The marketing strategies employed by Spiffy were fraught with issues, compounding the challenges faced by Plaintiffs. Key problems included an inability to accurately track advertising spend or differentiate between promotional and organic search traffic. There was also a notable absence of strategic input on advertising focus and a lack of support for integrating marketing efforts with new business leads.

**v.    Spiffy's Technical Issues**

68.    Adding further strain to Plaintiffs' operational challenges was the malfunctioning of the "Conductor" application, intended for scheduling and processing the services performed by franchisees.

The application was riddled with errors, frequently displaying messages such as "oops something went wrong, please try again."

69.     This not only restricted service delivery but also significantly disrupted daily operations. Markajani proactively submitted a total of eleven (11) help desk tickets concerning various bugs and issues with the Conductor application.

70.     The remaining issues that Plaintiffs experienced involved difficulties in creating new accounts and servicing existing clients. The steps required to establish a new Fleet Branch and navigate the application were not user-friendly and often necessitated additional support. Furthermore, when attempting to pull operational reports, the application frequently displayed error messages, causing significant frustration and inefficiency.

71.     These technological shortcomings within the Conductor application not only undermined the efficiency of service delivery but also placed undue operational burdens on Plaintiffs, reflecting poorly on Spiffy's commitment to supporting its franchisees through robust and reliable technological tools.

72.     Additionally, the fleet application developed for client use was deficient, lacking complete service packages and often requiring manual intervention by Plaintiffs' team to input and confirm appointments. Technicians, while performing services using devices provided by Spiffy, frequently had to manually search for information such as filters, oil viscosity, and the required quantity of quarts because the Application Program Interface (API) failed to retrieve vehicle specifications accurately.

**C.      Spiffy's Practices Forced MJ Enterprise Holdings to Cease Operations**

73.     Plaintiffs ultimately made the difficult decision to shut down the Spiffy franchise, driven by a series of deceptive business practices employed by the company. Misled at every turn, Plaintiffs were encouraged to adopt unethical and illegal business strategies purportedly aimed at ensuring the success of the franchise.

74.     The core reasons for terminating the franchise stemmed from systemic deceit and manipulative tactics. For instance, Plaintiffs were advised to purchase three 500-gallon tanks despite only two being necessary.

75.    Plaintiffs were instructed to secure a commercially zoned auto repair shop, while later discovering that Spiffy operations were being conducted out of storage units in Rochester and Syracuse, New York, and that other franchise locations were similarly situated.

76.    Furthermore, Markajani was propositioned to take over a failing corporate location in Delaware with little to no incentive offered; the location was shuttered merely a week later. These practices highlighted a pattern of misleading and unethical directives from Spiffy, compounded by high turnover among key franchise personnel, either through voluntary departure or termination.

77.    Upon expressing the intention to exit the franchise, Plaintiffs received no support or guidance on the process. An interaction with Spiffy's then Vice President, Mike Tolzman—who was subsequently dismissed—revealed that Spiffy was interested in taking over Plaintiffs' vehicle leases. However, subsequent attempts to engage with Spiffy through Connor Finnegan on July 6th, 2023, were met with silence, further exemplifying the lack of support and the disconnect within Spiffy.

78.    These experiences collectively underscored a business environment rife with malpractice, misrepresentations and misguidance, leading Plaintiffs to conclude that continuing with the Spiffy franchise was untenable and contrary to principles of ethical business conduct.

**D.    Spiffy's Fraudulent Misrepresentations**

79.    It is now abundantly clear that Plaintiffs, like many other Spiffy franchisees, were induced by Defendants through blatant misrepresentations and concealed material facts to become franchisees.

80.    Defendants' false and fraudulent statements include, but are not limited to the following:

a.    Spiffy had a fully formulated and thoroughly tested business model, strategy and service concept that was both achievable, sustainable, and profitable.

b.    Spiffy-negotiated National Accounts were profitable for franchisees to service.

c.    Spiffy would not arbitrarily compete with its franchisees and undermine the value of the franchise.

d.    Spiffy had substantial resources and infrastructure available to support inexperienced franchisees.

e.  No prior experience was needed to operate the Spiffy franchise successfully.

f.  Spiffy had an existing marketing campaign tailored not only to the business, but to the expertise of the franchisees, and the geographic scope of the franchise network.

g.  The Spiffy franchise required an investment appropriate for the opportunity.

81.  Plaintiffs would not have entered into the Franchise Agreement had they known the truth. Indeed, these falsehoods were a substantial factor in inducing Plaintiffs to invest in Spiffy in the first place.

82.  Had the foregoing represented the extent of Defendants' wrongdoing, Plaintiffs would unquestionably be entitled, at minimum, to have the Franchise Agreement rescinded, and to be restored to the financial position they would have been in without the misconduct of Spiffy.

83.  However, Defendants' misconduct extends much further.

84.  Apparently not content with limiting itself to direct misrepresentations to potential franchisees, Spiffy's Franchise Disclosure Document ("FDD") filed with various states' regulatory agencies, and therefore presumed accurate, made the direct misrepresentations appear even more believable.

85.  However, it is now apparent that many of the state regulatory filings contain material misrepresentations and failed to include key information otherwise communicated to Plaintiffs.

86.  Under the Maryland Franchise Law and Registration (MFLR), in an offer to sell a franchise, a person may not "make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading." Maryland Code of Business Regulation § 14-229. Similarly, § 14-227 holds franchisor civilly liable for untrue statements and omissions made to franchisees

87.  Defendants' misconduct, violating the laws of several states, is also prohibited by Federal law. For example, it is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act ("FTC Act") for any franchise seller covered by part 436 to: (a) Make any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed by

14

COMPLAINT

this part."

88.     Defendants' actions also violate the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," as amended (the "Franchise Rule").

89.     The Franchise Rule helps prospective entrepreneurs evaluate the risks and benefits of a franchise opportunity.

90.     In marketing and selling Spiffy franchises, Defendants failed to comply with the Franchise Rule in several respects.

91.     Among other things, Defendants failed to include key information to enable Plaintiffs and other Spiffy franchisees to analyze earning representations in the disclosure documents.

92.     Worse, Defendants misguided Plaintiffs through representations in the documents that contradicted other statements they made to prospective franchisees.

93.     Further troubling is Defendants' inconsistent treatment of the franchisees, which seems oriented less toward their success and more toward maximizing royalty income to Spiffy at all costs.

94.     Upon information and belief, Spiffy received undisclosed direct financial benefits from certain vendors/distributors in exchange for directing business from the Spiffy franchises.

95.     Upon information and belief, Spiffy is withholding earned fees from franchisees in order to address shortcomings in its own liquidity needs.

## FIRST CLAIM FOR RELIEF

### Fraudulent Inducement

### (Against All Defendants)

96.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

97.     To induce Plaintiffs to purchase a franchise, Defendants made numerous affirmative misrepresentations regarding the franchise being offered to Plaintiffs, including the false statements in the FDD set forth above.

98.     Defendants also made, inter alia, the following misrepresentations: (1) they would provide

15

COMPLAINT

Plaintiffs with supervision, training, assistance, guidance, proprietary education, and services related to the operation of the Spiffy franchise; (2) Spiffy would provide Plaintiffs with training, products, supplies, equipment, advertising, and promotion; (3) a Spiffy franchise is a low investment, that franchisees could operate efficiently with minimal labor; (4) Defendants represented that the Spiffy franchise network is successful and has established standards; (5) the costs of ownership of the franchises; (6) Spiffy had a fully formulated and thoroughly tested business model, strategy and service concept that was achievable, sustainable, and profitable; (7) Spiffy-negotiated National Accounts were profitable for franchisees to service; (8) Spiffy would not arbitrarily compete with its franchisees and undermine the value of the franchise; (9) Spiffy had substantial resources and infrastructure available to support inexperienced franchisees; (10) No prior experience was needed to operate the Spiffy franchise successfully; (11) Spiffy had an existing marketing campaign tailored not only to the business, but to the expertise of the franchisees, and the geographic scope of the franchise network; and (12) The Spiffy franchise required an investment appropriate for the opportunity.

99.    Defendants knew the representations were false at the time they were made or made the representations recklessly and without regard for the truth.

100.    Defendants intended that Plaintiffs would rely on the representations to secure their business as Spiffy franchisees.

101.    Plaintiffs reasonably relied upon the representations in deciding to purchase a franchise from Spiffy and in signing the Franchise Agreement.

102.    Plaintiffs' reliance was reasonable and justifiable, as they had no reason to question or doubt Defendants' intentions.

103.    Plaintiffs' reliance on Defendants' representations was a substantial factor in causing them harm.

104.    As a result of its reliance on Defendants' representations, Plaintiffs have been damaged in an amount to be determined at trial.

105.    Defendants' actions were willful, wanton, malicious, and oppressive such as to entitle

Plaintiffs to punitive damages in an amount according to proof at trial but believed to be in excess of $4,500,000.

106.    Defendants' actions also constitute actual malice. Accordingly, Plaintiffs are entitled to receive punitive damages in an amount sufficient to punish Defendants and to deter similar future conduct.

## SECOND CLAIM FOR RELIEF

### Negligent Misrepresentation

### (Against All Defendants)

107.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

108.    Defendants made numerous misrepresentations, both written and verbal communications with Plaintiffs.

109.    Defendants represented to Plaintiffs that these misrepresentations were true.

110.    Defendants' misrepresentations were not true.

111.    Although Defendants may have honestly believed the misrepresentations were true, they had no reasonable grounds for believing they were true when they made them.

112.    Defendants intended that Plaintiffs rely on the misrepresentations to secure their business as Spiffy franchisees.

113.    Plaintiffs reasonably relied on Defendants' misrepresentations.

114.    Plaintiffs' reliance on Defendants' representations was a substantial factor in causing them harm.

115.    Plaintiffs were damaged, in an amount to be determined at trial, as a result of reasonably relying on Defendants' misrepresentations.

//

//

//

## THIRD CLAIM FOR RELIEF

17

COMPLAINT

**Fraudulent Concealment**

**(Against All Defendants)**

116.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

117.     Defendants had an affirmative duty under the U.S. Federal Trade Commission's Franchise Rule and MFLR to make certain disclosures to Plaintiffs in their FDD, and Defendants willfully failed to make all of the required disclosures to Plaintiffs. Defendants also willfully omitted material facts that were necessary in order to make other statements made by them, in the light of the circumstances under which they were made, not misleading.

118.     For instance, in its FDD, Defendants failed to disclose the estimate of Plaintiffs' initial investment to operate the franchise, including that the initial investment estimate might be low, or that it could fluctuate depending on higher costs for certain items.

119.     Defendants touted Enterprise Rent-A-Car, and U-Haul, among others, as a significant factor in Spiffy's profitability when Defendants knew that the profitability was caused by Defendants' fraudulent misrepresentations.

120.     Defendants also failed to disclose that Plaintiffs would be forced to service national accounts at a loss.

121.     Defendants knew the information they did not disclose in the FDD, and that other facts not shared with Plaintiffs, were material and that Plaintiffs were likely to rely on Defendants' intentional failure to disclose those facts.

122.     Plaintiffs did not know of the concealed and omitted facts.

123.     Defendants intended to deceive Plaintiffs by concealing the foregoing facts. Had Defendants disclosed the concealed facts, Plaintiffs would not have signed the Franchise Agreement and would not have entered into the franchise relationship with Spiffy.

124.     Plaintiffs harmed in numerous ways, including, but not limited to, spending significant amounts of time and money on their franchise they otherwise never would have purchased.

18
COMPLAINT

125.     Defendants' concealment was a substantial factor in causing Plaintiffs' harm.

126.     Plaintiffs were damaged in an amount to be determined at trial.

127.     Defendants acted with actual malice such as to entitle Plaintiffs to punitive damages in an amount according to proof at trial but believed to be in excess of $900,000.

128.     Plaintiffs are entitled to receive punitive damages in an amount sufficient to punish Defendants and to deter similar future conduct.

**FOURTH CLAIM FOR RELIEF**

**Violation of MFLR – Maryland Code, Business Regulation Section 14-227 et seq.**

**(Against All Defendants)**

129.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

130.     The MFLR specified that a franchisor may not, directly or indirectly" make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading [and] engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person." Md. Code, Bus. Reg. § 14-229.

131.     Defendants violated Section 14-229 of the MFLR by enticing Plaintiffs to buy a franchise through misrepresentations and omissions.

132.     Defendants also violated Section 14-227 of the MFLR and are civilly liable for selling the franchise "by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission."

133.     Defendants violated Sections 14-229 and 14-227 of the MFLR by willfully making untrue statements of a material fact to Plaintiffs to entice them to purchase a franchise.

134.     The Individual Defendants materially aided Spiffy in violating the MFLR in the ways enumerated above, and therefore are jointly and severally liable with Spiffy for those violations pursuant

19

COMPLAINT

to Section 14-227 of the MFLR.

135.    Plaintiffs were harmed by Spiffy's violations of the MFLR, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Violation Maryland Consumer Protection Act (MCPA)

### Commercial Law, Title 13, Sections 13-303

### (Against All Defendants)

136.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

137.    By their wrongful acts and omissions, Defendants engaged in unfair, abusive, and deceptive trade practices in violation of Section 13-303.

138.    Defendants made numerous material misrepresentations about the Spiffy franchise in order to bait prospective franchisees, including Plaintiffs, into joining the Spiffy system. Once baited, Defendants required Plaintiffs to execute boilerplate contracts of adhesion in the form of the Franchise Agreement, offering merely illusory negotiation power despite Plaintiffs' lack of genuine opportunity to negotiate substantive terms. After obtaining Plaintiffs' signatures, collecting initial franchise fees, and locking Plaintiffs into multi-year contracts, Defendants shirked their agreed-to obligations under the Franchise Agreement, including but not limited to providing supervision, training, assistance, support, and other services.

139.    Defendants' wrongful acts and omissions precluded Plaintiffs from developing successful businesses. The foregoing conduct is exactly the kind of unfair, abusive, and deceptive trade practices that Section 13-303 seeks to prevent.

140.    Plaintiffs are informed and believe, and on that basis allege, that Defendants also engaged in the unfair, abusive, and deceptive behavior of receiving kickbacks from vendors that were not disclosed to Plaintiffs.

141.    Defendants' wrongful acts and omissions as alleged have allowed them to reap unfair

benefits and make substantial sales and profits while Plaintiffs struggled to run profitable their Spiffy franchise. As a result of Defendants' unfair, abusive and deceptive trade practices, Plaintiffs have been injured and has suffered and will continue to suffer substantial damages, including being deprived of making their own sales and profits, in an amount to be determined at trial.

142.    As a result of Defendants' unfair, abusive and deceptive trade practices, Plaintiffs have suffered and, in the absence of injunctive equitable relief, will continue to suffer irreparable harm, that cannot readily be remedied by damage remedies. Plaintiffs seek injunction against Defendants pursuant to Section 13-406 to restore the money acquired from Defendants and to prevent Defendants from such further unfair, abusive and deceptive trade practices in the future.

143.    Plaintiffs further seek an order freezing Spiffy's assets or imposing a constructive trust over all monies and assets in Defendants' possession that rightfully belong to Plaintiffs.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Spiffy)

144.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

145.    Under the Franchise Agreements, Spiffy undertook multiple contractual obligations. As detailed above, these obligations relate to, inter alia, National Accounts; Service Vehicles; Training Program; Operations Manuals; Selecting Vendors; Advertising and Promotion; and Pricing. Despite agreeing to these obligations, Spiffy failed to meet them.

146.    Throughout the course of its franchise relationship with Plaintiffs and after, Spiffy did not fulfill and breached its contractual obligations and promises.

147.    Plaintiffs performed all, or substantially all, of the promises, conditions, and covenants agreed to be performed pursuant to the terms of the Franchise Agreement, except for any and all promises, conditions, and covenants excused by the acts and omissions of Spiffy.

148.    Any and all conditions for Plaintiffs' performance had occurred or were waived or excused.

149.    As a proximate result of Spiffy's breach, Plaintiffs have lost the benefit of their bargain and suffered damages.

150.    Plaintiffs have been harmed and have suffered and will continue to suffer substantial damages in an amount to be proven at trial.

151.    Spiffy's breach of the Franchise Agreement was a substantial factor in causing Plaintiffs' harm.

## SEVENTH CLAIM FOR RELIEF

### Accounting

### (Against Spiffy)

152.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

153.    A contractual relationship existed between MJ Enterprise Holdings and Spiffy.

154.    MJ Enterprise Holdings is unable to determine the exact amount of money owed to it by Defendants as a result of their conduct, as alleged in this claim, without an accounting.

155.    Due to Spiffy's violation of MFRL Section 14-227, MJ Enterprise Holdings is entitled to restitution from Spiffy for the value of the franchised business and franchise assets, as well as any other relief necessary to restore MJ Enterprise Holdings to its original position prior to the violation. To accurately determine the scope of this restitution, an accounting is necessary.

156.    Spiffy has not charged MJ Enterprise Holdings correct royalties.

157.    Despite Plaintiffs' requests, there has been no proper accounting or examination of Spiffy's books and records sufficient to analyze its accounting practices and methods.

158.    Accordingly, Plaintiffs request an accounting of all unsettled accounts between MJ Enterprise Holdings and Spiffy.

## EIGHTH CLAIM FOR RELIEF

### Rescission

### (Against Spiffy)

159.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

160.     Plaintiffs entered into the Franchise Agreement based upon the fraudulent representations of Defendants as alleged herein. Defendants made fraudulent representations, claiming that Spiffy had a fully formulated and thoroughly tested business model, strategy, and service concept that was sustainable and profitable. Defendants additionally fraudulently claimed that Spiffy had substantial resources and infrastructure available to support inexperienced franchisees, as Defendants claimed that no prior experience was needed to operate a Spiffy franchise successfully.

161.     These fraudulent representations, along other misrepresentations, induced Plaintiffs into signing the Franchise Agreement.

162.     Due to Defendants' fraudulent misrepresentations, and due to Defendants' knowing violation of the MFRL, Plaintiffs are entitled to rescind the Franchise Agreement and have done so appropriately.

### NINTH CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. § 1961 et seq.**

**(Against All Defendants)**

163.     Plaintiffs incorporate by reference and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

164.     Plaintiffs are informed and believe, and on that basis allege, that Defendants, and each of them, as well as unnamed third parties, conspired to, and engaged in, a pattern of racketeering activity within the last five years by engaging in two or more instances of illegal conduct in connection with their dealings with franchisees, especially with Plaintiffs.

165.     Defendants have violated 18 U.S.C. §1962(c) because they have conducted the affairs of an enterprise through a pattern of racketeering activity.

166.     The "enterprise" in this case is the association-in-fact of all Defendants. This enterprise exists for the common purpose of developing and marketing the Spiffy franchise system with the intent to

defraud prospective franchisees. The enterprise has a defined structure, with Spiffy Franchising and Get Spiffy as the parent companies, and the Individual Defendants as officers and key personnel. The enterprise functions through the coordinated actions of its members, who each play a role in the fraudulent scheme.

167.     The predicate crimes committed by Defendants include, but are not limited to, money laundering, racketeering, use of the U.S. mails to conduct transactions (mail fraud, as defined by 18 U.S.C. §1341), use of telephonic or other wires in carrying out transactions (wire fraud, as defined by 18 U.S.C. §1343), obstruction of justice, and other prohibited activities. These acts are not isolated or sporadic; they are part of a continuous and related scheme to defraud franchisees.  The use of mails and wires to communicate misrepresentations and omissions to prospective franchisees is a regular and predictable part of the enterprise's operations.

168.     Further, in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343, Defendants devised and effected a scheme to defraud Plaintiffs and to obtain money from Plaintiffs by means of fraudulent pretenses. Specifically, Defendants, and each of them, fraudulently induced Plaintiffs, and other franchisees, to purchase businesses by intentionally misrepresenting material information to Plaintiffs, and other franchisees, including the financial prospects of the franchisees.

169.     The execution of the scheme to defraud by Defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses United States mails and interstate wire communications were reasonably foreseeable by Defendants.

170.     Specific instances include: Plaintiffs received shipments or deliveries of products in connection with the Franchise Agreement, where said goods were delivered via the United States mails and/or private carriers; Plaintiffs received electronic mail and text messages from Defendants relating to the Franchise Agreement.

171.     The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5). Specifically, the acts of mail fraud and

wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities while repeatedly making misrepresentations regarding Plaintiffs' Petland store. Additionally, based on information and belief, other Spiffy franchisees across the United States, current and past, have also been victimized by this fraudulent scheme.

172.    Defendants constitute persons that have violated 18 U.S.C. § 1961, et seq. in relationship to the enterprise, which is the Spiffy franchise system., acting as an association-in-fact.

173.    Defendants' actions constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1961, et seq., in that Defendants' violations of this statute are system wide.

174.    The actions of Defendants, and each of them, as alleged herein, were taken with the intent of deceiving Plaintiffs and defrauding them in an amount to be determined at trial. In addition, the criminal actions of Defendants, and each of them, have had the effect of harming Plaintiffs' pecuniary interests.

175.    As a direct and proximate result of the above actions of Defendants, and each of them, Plaintiffs have suffered harm entitling them to compensatory, punitive, and treble damages pursuant to 18 U.S.C. §1964 in an amount according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and an award against Defendants as follows:

1.    For general, special, and compensatory damages according to proof at trial, but believed to be in excess of $300,000;

2.    For punitive and exemplary damages in an amount according to proof at trial, but believe to be in excess of $900,000;

3.    For pre- and post-judgment interest at the maximum rate allowed by law;

4.    For an accounting as alleged herein;

5.    For a preliminary injunction and permanent injunction against all Defendants;

6.    For compensatory, punitive, and treble damages pursuant to 18 U.S.C. §1964 in an amount according to proof at trial;

7.    For the recovery of reasonable attorneys' fees;

8.      For the costs of this suit; and

9.      For such other and further relief as the Court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

|                              |                                         |
|------------------------------|-----------------------------------------|
|                              | Respectfully submitted,                 |
|                              | **DRUVEN PC**                           |
| Date: November 4, 2024       | By: *<u>/s/ Casey Bryant</u>*           |
|                              | Casey Bryant                            |
|                              |                                         |
|                              | Attorney for Plaintiffs,                |
|                              | MJ Enterprise Holdings, Inc., a Maryland|
|                              | Corporation; Ross Markajani, an individual |

26
COMPLAINT